**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Admiral Insurance Company, | No. CV-14-08152-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Community Insurance Group SPC Limited, | |
| Defendant. | |

The parties have filed cross-motions for summary judgment.  Docs. 189, 191.  The motions are fully briefed, and the Court heard oral argument on November 18, 2016.  The Court will deny Plaintiff's motion and grant Defendant's motion.

## I.    Background.

This case involves a dispute over insurance coverage for a physician, Dr. Anthony Schwartz, who was sued for medical negligence.   Dr. Schwartz had a professional liability policy through Plaintiff Admiral Insurance Company ("Admiral").  Dr. Schwartz was employed by the Bullhead City Clinic (the "Clinic"), and the Clinic had its own liability policy through Defendant Community Insurance Group SPC Limited ("CIG").

### A.    Dr. Schwartz's Employment and Insurance Coverage.

On September 1, 2007, Dr. Schwartz entered into an employment agreement with the Clinic.  Docs. 192, ¶ 1; 196, ¶ 1.[1]  Dr. Schwartz applied for professional malpractice

---

[1] Citations to the parties' statements of fact refer to both the cited paragraph and any response included in the paragraph.  Citations to a page number refer to the page attached at the top of the page by the Court's CMECF system.

liability insurance with Admiral, and Admiral issued him a primary Physicians, Surgeons & Dentists Professional Liability Policy, EO000009373 (the "Admiral Policy"). Doc. 192, ¶¶ 6, 9.

The Clinic is owned by Community Health Systems, Inc. ("CHS"), a corporation that owns hundreds of hospitals and clinics in 22 states.  Doc. 191 at 2-3.  CIG is a captive insurer owned by CHS.  *Id.*  Every physician employed at a CHS-affiliated hospital or clinic is required to have primary professional liability insurance.  *Id.*  CHS entities like the Clinic offer their physicians two means of obtaining liability insurance: (1) CHS procures and maintains the insurance, in which case it uses its captive insurer CIG as the primary insurer, or (2) the physician obtains insurance from an outside commercial carrier, in which event CHS pays the premiums.  *Id.*  Dr. Schwartz chose the second option and obtained his insurance from Admiral.

CIG also issued a single master policy to all CHS entities, naming each clinic or hospital as a named insured.  *Id.* at 4.  The Clinic was covered by such a policy in this case, Policy No. 274/CIG10 (the "CIG Policy").  *Id.*  The CIG Policy insured the Clinic, and also provided coverage to already-insured employees like Dr. Schwartz.  *Id.*

Admiral argues that the CIG Policy and the Admiral Policy are both primary liability policies for Dr. Schwartz.  Doc. 189 at 11-12; Doc. 195 at 2.  CIG asserts that its policy provides only excess coverage for Dr. Schwartz, and applies only after the limits of his primary policy – the Admiral Policy – are exhausted.  Doc. 192, ¶¶ 20-23.

**B.    The Underlying Litigation.**

In May 2010, Gale and Earl Radmall filed a medical negligence suit against Dr. Schwartz (the "underlying litigation").  *Id.*, ¶ 24.  Admiral retained counsel to defend Dr. Schwartz and provided coverage without a reservation of rights.  *Id.*, ¶ 27.  In October 2010, the Radmalls learned that Dr. Schwartz was a Clinic employee with an additional insurance policy through the Clinic.  *Id.*, ¶¶ 31-32.  In early 2011, the Radmalls added the Clinic as a defendant in the underlying litigation, and CIG retained counsel to defend the Clinic.  *Id.*, ¶¶ 34-36.

In September 2012, Admiral settled the underlying litigation against Dr. Schwartz for $425,000. *Id.*, ¶ 49. In November 2012, CIG settled the underlying litigation against the Clinic in a separate, confidential settlement agreement. *Id.* Admiral filed this action against CIG on August 14, 2014, seeking equitable contribution for payments it made on behalf of Dr. Schwartz. Doc. 1. Following discovery, the parties briefed extensive cross-motions for summary judgment. Docs. 121, 122, 128, 129, 130, 148, 149, 150, 153, 154, 155. On August 26, 2016, the Court held a conference with the parties and directed that the motions be briefed in a more focused manner. Doc. 160. All pending motions were denied as moot and the parties were instructed to brief cross-motion for summary judgment on two issues: (1) is the CIG Policy primary or excess, and (2) if the CIG Policy is primary, is Admiral's recovery barred by the selective tender rule or for failure to reserve rights? *Id.* The Court will resolve this case on the first issue.[2]

## II.   Legal Standards.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Both parties move for summary judgment, and neither suggests that a factual dispute precludes summary judgment in this case.

The parties agree that Arizona law governs this case. Doc. 189 at 6; Doc. 191 (citing Arizona law throughout). In Arizona, the interpretation of an insurance contract is a question of law to be determined by the court. *Sparks v. Republic National Life*, 647 P.2d 1127, 1132 (Ariz. 1982). The provisions of an insurance contract are interpreted

---

[2] The parties' briefing contains many facts about their respective strategies and positions in the underlying litigation. Plaintiffs focus particularly on CIG's failure to disclose the CIG Policy, which CIG regards as proprietary and confidential. The Court finds these facts irrelevant to the policy-construction issues in this case, and therefore does not recount them in this order.

according to their plain and ordinary meaning.  *Nat'l Bank of Ariz. v. St. Paul Fire and Marine Ins. Co.*, 975 P.2d 711, 713 (Ariz. Ct. App. 1999).  "[T]o determine the meaning of a clause which is subject to different interpretations or constructions, [courts] examin[e] the purpose of the clause, public policy considerations, and the transaction as a whole."  *Ariz. Prop. & Cas. Ins. Guar. Fund v. Helme*, 735 P.2d 451, 456-57 (Ariz. 1987); *see also Transamerica Ins. Group v. Meere*, 694 P.2d 181, 185 (Ariz. 1984).

"[E]quitable 'contribution theory is based upon the equitable principle that where two companies insure the same risk and one is compelled to pay the loss, it is entitled to contribution from the other.'"  *Virginia Sur. Ins. Co. v. RSUI Indem. Co.*, No. 09-cv-928-PHX-JAT, 2009 WL 4282198, at *4 (D. Ariz. Nov. 25, 2009) (quoting *Indus. Indem. Co. v. Beeson*, 647 P.2d 634, 637 (Ariz. Ct. App. 1982)).  "Equitable contribution 'is not derivative from any third person, but exists as an independent action by one insurer against another.'"  *Navigators Specialty Ins. Co. v. Nationwide Mut. Ins. Co.*, 50 F. Supp. 3d 1186, 1194 (D. Ariz. 2014) (quoting *Am. Cont'l Ins. Co., Inc. v. Am. Cas. Co. of Reading, Pa.*, 903 P.2d 609, 610 (Ariz. Ct. App. 1995)).  "The doctrine applies only when co-insurers have covered the same insured and the same particular risk at the same level of coverage."  *Virginia*, 2009 WL 4282198 at *4 (quoting *U.S. Fid. & Guar. Co. v. Fed. Rural Elect. Ins. Corp.*, 37 P.3d 828, 832 (Okla. 2001)).

Primary insurance generally has the first duty to indemnify and defend the insured.  *Am. Family Mut. Ins. Co. v. Cont'l Cas. Co.*, 23 P.3d 664, 666 (Ariz. Ct. App. 2001).  An excess insurer normally is not obligated to indemnify or defend until all applicable primary insurance has been exhausted.  *Id.*  No right to equitable contribution generally exists between a primary and excess insurer because "they are covering separate and clearly defined layers of risk."  *Virginia*, 2009 WL 4282198 at *4.

## III.   Analysis.

Admiral moves for summary judgment on its claim that CIG is a primary insurer and must equitably contribute to the defense and indemnity costs of Dr. Schwartz in the underlying litigation.  Doc. 189 at 2.  CIG asks the Court to rule that it is not a primary

insurer of Dr. Schwartz and owes no contribution to Admiral.  Doc. 191 at 2.

### A.    CIG's Certificate of Insurance.

Admiral claims that CIG's obligation to provide primary coverage can be found in the one-page Certificate of Insurance ("COI") CIG provided to the Clinic.  Admiral quotes the COI as stating that the "[c]overage herein is afforded to all employees including physicians and allied health professional, when acting within the course and scope of their medical duties performed as employees of the [Clinic]."  Doc. 190-1 at 5.

But the COI also states, in capital letters, that it provides "information only and confers no rights upon the certificate holder.  This certificate does not amend, extend or alter the coverage afforded by the policies below."  *Id.*  The COI further states, again in capital letters, that "the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of such policies."  *Id.*

Courts enforce such language.  "'[W]hen a certificate of insurance contains language stating that the certificate does not amend, extend, or alter the terms of any insurance policy mentioned in the certificate, the terms of the certificate are subordinate to the terms of the insurance policy.'"  *James v. Burlington N. Santa Fe Ry. Co.*, No. CV05-04106-PCT-NVW, 2007 WL 2461685, at *14 (D. Ariz. Aug. 27, 2007) (quoting *TIG Ins. Co. v. Sedgwick James*, 184 F. Supp. 2d 591, 597 (S.D. Tex. 2001)).  As a result, "'[t]he certificate of insurance will not suffice to create insurance coverage if such coverage is precluded by the terms of the policy.'"  *Id.* (quoting *TIG*, 184 F. Supp. 2d at 597).

Arizona law agrees.  Arizona courts hold that a COI "cannot contradict the terms of a policy; it only provides information as to the policy's contents."  *Cont'l Cas. Co. v. Signal Ins. Co.*, 580 P.2d 372, 376 (Ariz. Ct. App. 1978); *see also James*, 2007 WL 2461685, at *14 ("In Arizona, the presentation of a certificate of insurance does not alone create coverage obligations or legal obligations between the insurer and the certificate holder."); *Mardian Equip. Co. v. St. Paul Fire & Marine Ins. Co.*, No. CV-05-2729-PHX-DGC, 2006 WL 2456214, at *2 (D. Ariz. Aug. 22, 2006) (same).

1    The Court accordingly holds that the COI does not provide primary coverage in

2    this case.  The Court must look to the insurance policies to determine their coverage.

3    **B.    Relevant Language of the Policies.[3]**

4    The Court's analysis starts with the plain and ordinary meaning of the policies'

5    language.  *Nucor Corp. v. Employers Ins. Co. of Wausau*, 296 P.3d 74, 77 (Ariz. Ct. App.

6    2012).  The CIG Policy provides coverage for any act, error or omission which arises out

7    of the rendering of medical services.  Doc. 190-3 at 11.  The policy defines "Additional

8    Insureds" to include "Medical Staff" (*id.* at 26), and the parties agree that Dr. Schwartz is

9    covered by this language (Doc. 189; Doc. 191 at 5).

10   Section 4.1(B)(4) of the CIG Policy is an "other insurance" clause.  It is the

11   provision that makes the CIG Policy excess:

12   > Other Insurance.   If any employee . . . has another policy or
13   > policies covering a loss insured hereunder, the insurance with respect to
     > such loss under this Policy shall be excess over the amount set forth as the
14   > limit of liability under such other policy or policies . . . .

15   Doc. 190-3 at 26-28.  CIG argues that because Dr. Schwartz had professional liability

16   insurance under the Admiral Policy that covered the Radmalls' claim, the CIG Policy

17   provided only excess coverage in light of this provision.  Doc. 191 at 11.

18   Admiral disagrees, and cites § 5.6(C) of the CIG Policy's "General Provisions,"

19   which states:

20   > Other Insurance.  The insurance afforded by this Policy is primary
     > insurance, except when the self insurance retention has not been exhausted
21   > or when this Policy is stated to apply in excess of or contingent upon the
     > absence of other insurance. . . .
22

23   Doc. 190-3 at 42.  Admiral argues that this language expressly identifies the CIG Policy

24   as primary (Docs. 189 at 11, 195 at 3), but this argument ignores the clear exception to

25   _____

26   [3]  In this section, and in other sections of this order, the Court quotes language
     from the CIG Policy.  CIG asked that the Court seal documents containing its policy
     language, but spoke of and displayed these provisions in open court during the summary
27   judgment hearing, without requesting that the hearing or its record be sealed.   More
     importantly, the Court finds that the CIG Policy language quoted in this order is largely
28   generic and is essential to understanding the Court's decision on dispositive motions.
     Thus, the Court finds no compelling reason to withhold this information.

the primary insurance declaration:  "except when . . . this [CIG] Policy is stated to apply in excess of . . . other insurance" (Doc. 190-3 at 42).  Section 4.1(B)(4), which is quoted above and found in the policy section for "Additional Insureds" like Dr. Schwartz, clearly states that the CIG insurance is excess in this case.

The Court finds the language of the CIG Policy to be clear.  The policy provides only excess coverage to Dr. Schwartz because he had another policy – the Admiral Policy – that covered the loss at issue in the underlying litigation.

### C.    Are the "Other Insurance" Clauses Mutually Repugnant?

An "other insurance" clause in a policy of insurance "seek[s] 'to limit or eliminate coverage under the policy in the event the insured has other insurance available." *Fremont Indem. Co. v. New England Reinsurance Co.*, 815 P.2d 403, 404 (Ariz. 1991). When competing insurance policies both contain "other insurance" clauses that apply to the same claim, a court must determine which clause, if any, will be given effect over the other.  *Id.*  If the clauses do not conflict, the court should apply the clauses as written. *Dairyland Mut. Ins. Co. v. Andersen*, 433 P.2d 963 (Ariz. 1967); *see also Allstate Ins. Co. v. Great Am. Ins. Cos.*, 4 P.3d 991, 992-94 (Ariz. Ct. App. 2000).  But "where two policies cover the same occurrence and both contain 'other insurance' clauses, the [other] insurance provisions are mutually repugnant and must be disregarded.  Each insurer is then liable for a pro rata share of the settlement or judgment."  *Fremont*, 815 P.2d at 405 (quoting *Harbor Ins. Co. v. United Services Auto. Ass'n.*, 559 P.2d 178, 183 (Ariz. Ct. App. 1976)).

To determine whether two "other insurance" clauses are mutually repugnant, the critical inquiry is whether the effect of applying both clauses leads to a circular debate in which neither insurer is required to provide coverage.  *See id.* at 407.  In *Fremont*, the Arizona Supreme Court was asked to resolve a conflict between two insurance policies containing "other insurance" clauses.  *Id.* at 403.  In the underlying claim, an attorney was sued for malpractice.  *Id.* at 404.  The attorney had two relevant insurance policies, one with Freemont Indemnity Company and the other with New England Reinsurance

Company.  *Id.*  New England denied coverage, and Freemont agreed to defend the attorney with a reservation of rights.  *Id.*  Freemont settled the claim and then sued New England, arguing that Freemont's "other insurance" policy dictated that New England pay the settlement in excess of the New England policy's deductible.  *Id.*

The Supreme Court looked to the effect of both policies' "other insurance" clauses.  *Id.*  Freemont's policy contained a clause under which Freemont escaped liability if the insured's loss was less than any other insurance protection, and was obligated to provide excess coverage if the loss exceeded the other valid insurance.  *Id.*  The New England policy, on the other hand, provided that

> this policy shall . . . be in excess of any other valid and collectible insurance available to the Insured, whether such insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

*Id.*  The Supreme Court found that the effect of these two policies was to "promote a circuitous debate in which each insurer, claiming that its policy must be read first, refuses to pay at all."  *Id.*  The Court found the clauses to be mutually repugnant and held that they should be disregarded, with costs to be shared equally between the insurers.  *Id.* at 407-08.

Not all "other insurance" clauses are mutually repugnant.  In *Allstate*, the underlying litigation involved a boating accident where an individual other than the boat's owner was driving at the time of the accident.  *Allstate*, 4 P.3d at 991.  One insurer, Allstate, had issued boat coverage to the boat owner, and the other insurer, Great American, had issued insurance to the boat driver.  *See id.*  Allstate sued Great American, seeking the correct allocation of liability under the respective policies for injuries sustained by a boat passenger in the accident.  *Id.*  Allstate's "other insurance" clause provided that "[i]f both this insurance and other insurance apply to a loss, we will pay our share.  Our share will be the proportionate amount that the limits of this insurance bears to the total limits of all applicable insurance."  *Id.* at 992.  Great American's policy provided that "[t]his insurance is excess over other valid and collectible insurance except

insurance written specifically to cover as excess over the limits of liability that apply in this policy." *Id.* Citing *Freemont*, Allstate argued that these clauses were mutually repugnant, both must be disregarded, and the loss should be allocated proportionally between the insurers. *Id.*

The Arizona Court of Appeals found that the two clauses could be applied at the same time according to their terms. *Id.* at 993. The court reasoned that Great American's "other-insurance clause makes coverage strictly excess if 'other valid and collectable insurance' exists[, and] there is no dispute that Allstate's coverage was 'other valid and collectable insurance here.'" *Id.* On the other side, "Allstate's clause limits Allstate's coverage to a pro-rata share of the insured's loss if other insurance is 'applicable.' Because the loss in this case did not exhaust Allstate's policy limits, Great American's excess coverage was not 'applicable.'" *Id.* As a result, the court held that the clauses were not mutually repugnant and that Great American's policy was excess. *Id.*

Admiral argues that the Court should disregard the "other insurance" clauses in the CIG Policy – the clauses that make its coverage excess – because they are mutually repugnant with a similar clause in the Admiral Policy. Doc. 189 at 12-13. The relevant clause in the Admiral Policy is § VIII(B). Doc. 170-2 at 10. It reads: "This insurance shall be excess of and not contribute with 'other insurance', whether collectable or not, that affords coverage for a 'medical incident'. . . . *This condition does not apply to 'other insurance' that is written to apply in excess of the limits provided by this policy*." Doc. 170-2 at 10 (emphasis added). Thus, although the Admiral Policy does include an "other insurance" clause that makes it excess, the italicized language makes clear that the clause does not apply when the other insurance "is written to apply in excess," as is the CIG Policy. The clauses are not mutually repugnant.

Like the clauses in *Allstate*, the "other insurance" clauses in this action may be applied at the same time in accordance with their terms. The CIG Policy is written to provide excess coverage to the Clinic's employees when those employees have coverage of their own, as did Dr. Schwartz. Doc. 190-3 at 26-28. The Admiral Policy's "other

insurance" clause specifically states that it "does not apply to 'other insurance' that is written to apply in excess of the limits provided by this policy."  Doc. 170-2 at 10.  Thus, the Admiral Policy's "other insurance" clause does not apply, the policy remains primary, and the clauses are not mutually repugnant.

Admiral argues that this interpretation of its "other insurance" clause is wrong.  Without citation to any legal authority, Admiral contends that the "written to apply in excess" language in § VIII(B) does not apply to the CIG Policy because that policy is not a "pure excess insurance polic[y]."  Doc. 195 at n.4; *see also* Doc. 189 at 10 n.10.  But the Admiral Policy language does not make this distinction.  It says nothing about a "pure" excess insurance policy.  It refers simply to insurance coverage "written to apply in excess," and the CIG Policy is so written.  Indeed, § 5.6(C) of the CIG Policy contains similar language, noting that it is excess when it is "stated to apply in excess" of other insurance.  Doc. 190-3 at 42.

Admiral attempts to support its reading by citing the deposition testimony of Stephen Jones, its Rule 30(b)(6) witness, but that testimony does not help.  Doc. 189 at 10 n. 10.  In addition to the fact that his testimony cannot alter the plain meaning of the Admiral Policy language, Mr. Jones interpreted the "written to apply in excess" language in an unremarkable manner:  "It basically says if a policy was written to be in excess of the limits provided, other insurance doesn't apply."  Doc. 190-6 at 22; *see also id*. at 23 ("if there's excess, the 'other insurance' clause doesn't apply"), 24 ("if there is a policy and it's written to apply in excess, then this clause is moot").

Admiral nonetheless argues that "written to apply in excess" means an exclusively excess policy that says so on its face, not a policy that becomes excess by application of an "other insurance" clause.  But the language of Admiral's Policy does not say this.  Section VIII(B) says that the policy remains primary if another insurance policy is "written *to apply* in excess," suggesting that if the application of the policy – such as through an "other insurance" clause – makes it excess, then Admiral's "other insurance" clause does not apply and the Admiral Policy remains primary.

Later in his deposition, Mr. Jones provided this slight elaboration:  "if it's a true excess policy and delineated as such, then this [the Admiral "other insurance" clause] doesn't apply."  *Id.* at 25.  But Mr. Jones provided no definition of a "true" excess policy, and did not tie this word to any language in § VIII(B).  Moreover, the Court concludes that the CIG Policy is "delineated" as excess by the plain language of § 4.1(B)(4) as explained above.  What is more, if Admiral had intended to mean a specific type of excess policy, it could have said so, as illustrated by the language from *Freemont*, 815 P.2d at 404 ("written only as a specific excess insurance over the limits of liability provided in this policy"), or, as CIG notes, by language from some of Admiral's other policies, Doc. 193 at 9 n. 7.

In short, the "other insurance" provisions of the Admiral and CIG Policies are not mutually repugnant.  Under their plain meaning, the CIG Policy is excess, the Admiral "other insurance" clause does not apply, and the Admiral Policy remains primary.

### D.     Totality of the Circumstances.

Although not needed in light of the policies' plain meaning, the Court also notes that its reading is supported by the totality of the circumstances.  As noted above, CHS requires its physicians to obtain primary insurance and agrees either to pay the premiums of that insurance or provide primary coverage through CIG.  CHS also procures a master CIG policy for the Clinic that includes excess coverage for employees.  The clear purpose of the "other insurance" clause in the CIG Policy – which was the master policy issued to the Clinic – was to avoid potentially redundant coverage with the primary coverage CHS was providing to Dr. Schwartz through the Admiral Policy.  It is undisputed that CHS paid the premiums for the Admiral Policy, and that Admiral collected roughly $250,000 in premiums from CHS.  Doc. 192, ¶¶ 15-19.

It would make little sense for CHS to pay substantial premiums for Admiral's primary coverage of Dr. Schwartz and, at the same time, provide additional primary coverage that would only reduce the Admiral coverage.  The CIG Policy was, quite logically, intended to provide primary coverage for CHS entities like the Clinic and

excess coverage for CHS employees who had their own primary insurance.

**IV.   Conclusion.**

The CIG Policy is a master policy covering hundreds of CHS subsidiaries and thousands of CHS employees.  The Admiral Policy is a primary policy with the sole purpose of providing coverage for Dr. Schwartz.  The CIG Policy's "other insurance" clause makes clear that the policy is excess when there is other insurance for a claim. The Admiral Policy also has an "other insurance clause," but states that the clause does not apply if the other insurance is excess.

The Court finds that the CIG Policy is excess and does not trigger the Admiral Policy's "other insurance" clause.  The Admiral Policy therefore remains primary, and primary insurance must be exhausted before excess insurance is obligated to pay.  *Am. Family Mut. Ins. Co.*, 23 P.3d at 666.  Admiral's primary coverage was not exhausted in the underlying litigation.  Accordingly, CIG, as the excess carrier, is not liable for equitable contribution.  In light of this conclusion, the Court need not address the parties' other arguments.

**IT IS ORDERED:**

1.   CIG's motion for summary judgment (Doc. 191) is **granted**.

2.   Admiral's motion for summary judgment (Doc. 189) is **denied**.

3.   The Clerk shall enter judgment accordingly and terminate this action.

Dated this 22nd day of November, 2016.

_____
David G. Campbell
United States District Judge

- 12 -